**FILED**
at \_\_\_O'clock & \_\_\_min \_\_\_M
MAR 2 2 2005
BRENDA K. ARGOE, CLERK
United States Bankruptcy Court
Columbia, South Carolina (7)

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: <br><br> Richard Jerome Breibart, <br> Debtor. | C/A No. 03-07440-W <br><br> Adv. Pro. No. 04-80195-W |
| Mary Breibart, <br> Plaintiff, <br><br> v. <br><br> Richard Jerome Breibart, <br> Defendant. | ORDER <br><br> Chapter 7 |

**ENTERED**
MAR 2 2 2005
S. R. P.

THIS MATTER comes before the Court upon on a complaint (the "Complaint") filed by Mary Breibart (the "Plaintiff") seeking a determination that debts owed to her by Richard Breibart ("Debtor" or "Defendant") are nondischargeable pursuant to 11 U.S.C. § 523(a)(5). Based upon the record of the case, arguments of counsel, and the evidence presented, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

1. Debtor and Plaintiff were married on May 14, 1988. The parties have two children, one born in 1985 and another in 1990.

2. During the marriage, the parties resided at 128 Hollow Cove Road in Lexington, South Carolina (the "Marital Residence").

3. During the marriage, Plaintiff pursued a college degree. Plaintiff's health suffered to the extent that she became disabled and was unable to attend school or work.

---

[1] The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

4.  Debtor is a practicing attorney with his own law practice.

5.  The parties became legally separated in 1996 and divorce proceedings commenced. Debtor and Plaintiff were divorced by issuance of a decree (the "Divorce Decree") in 1998 issued by the Family Court for the Eleventh Judicial Circuit (the "Family Court'). The Divorce Decree incorporated a Complete Custody, Support and Property Settlement Agreement (the "Agreement") entered into by the parties.[2]

6.  The Agreement provides as follows, in relevant part, under Section III, Alimony:

> III. ALIMONY:
>
> C. <u>Wife's Lump Sum Alimony Payable in Monthly Installments:</u> Husband shall pay Wife the sum of $1,000 per month, commencing and effective with the month of April 1998 and continuing through the month of September, 2005; beginning with the month of September, 2005 and continuing through the month of August, 2009, Husband shall pay Wife the sum of $300 per month. . . . The monthly alimony payments specified in this paragraph shall be taxable to Wife and deductible by Husband, and they shall terminate in the event of any of the following circumstances: Husband's death (subject to the insurance obligation set forth hereafter); Wife's death, or Wife's remarriage or cohabitation tantamount to marriage. These payments shall be non-modifiable; provided, however, in the event Wife secures employment in the future, the amount of monthly lump sum alimony shall be reduced by an amount equal to fifty percent (50%) of Wife's monthly income from that employment. This monthly alimony shall not be prepaid except by mutual agreement in writing.
>
> D. <u>Monthly Residence payments as Alimony</u>: As an additional incident of support for the benefit of Wife, without which Wife would be unable to meet her daily needs, Husband is required to pay in full and satisfy, by September 1, 2005, the current mortgage indebtedness on the Hollow Cove residence, as more fully set forth hereafter. However, pursuant to the elective provisions of S.C. Code Ann §20-3-130(F) (Cum.Supp. 1997) and in accordance with the elective provisions of §§215 and 71(b)(1)(B) of the Internal Revenue Code and §7.71-IT(b)(Q-8) of the Internal Revenue regulations, and although Husband shall be entitled to deduct the interest payments he makes on Schedule A of his tax return, the parties agree that no more than $1,000 per month of the principal payments made by Husband on the two residence mortgages shall be treated as alimony to Wife, taxable to Wife and deductible by Husband. As an alternative, Husband may, at his

---

[2] Unless otherwise indicated, the Court will generally refer to both the Divorce Decree and the Agreement as the "Agreement."

2

election, deduct up to $1,000 from the monthly mortgage obligation and pay that amount directly to Wife as alimony. In that event, Wife shall endorse the check over to the mortgage holder(s). Responsibility for all payments specified in this paragraph shall terminate in the event of any of the following circumstances: Husband's death; Wife's death; Wife's remarriage or cohabitation tantamount to marriage; or Wife permanently vacating the Hollow Cove residence, or selling it prior to October 2005, or failing to use it as the primary residence for herself and the children when they are with her. These payments shall otherwise be non-modifiable.

### IV. DIVISION OF MARITAL PROPERTY:

A. <u>Marital Residence:</u> The parties own a house and lot, the marital residence, at 128 Hollow Cove Road in Lexington, South Carolina, which residence is subject to two outstanding mortgages, to wit: a first mortgage to Saluda County Bank in the approximate amount of $111,313 as of February 18, 1998, and a second mortgage to Rachel Lindler in the approximate amount of $76,267 as of February 1998.

As of April 1, 1998, Wife shall have sole and exclusive use, possession and ownership of this property; provided, however, the actual transfer of title to Wife shall not take place until the mortgage indebtedness is paid in full by Husband or any other event occurs as set forth heretofore in Paragraph III, D [e.g. Husband's death], or as set forth hereafter.

Beginning with the month of April, 1998, Husband shall be responsible for timely making the monthly payments on the residence mortgage debt and shall pay and satisfy all outstanding indebtedness by September 2005. Additionally, Husband shall bring any delinquent mortgage amounts current by April 15, 1998. Husband shall be entitled, if he desires, to refinance the current debt provided he does not increase the principal amount or extend the term of the loan payoff beyond September 2005. Husband shall also be responsible for timely paying the real estate taxes assessed on this property. Beginning with the next renewal, on or about October 1998, Wife shall be responsible for providing, and paying for, the homeowner's insurance on this property and Husband shall maintain the coverage until such renewal. As of April 1, 1998, Wife shall be responsible for all other expenses related to the Hollow Cove residence, including but not limited to, the residence utilities, repairs and maintenance and within thirty (30) days of approval of this Agreement, Husband shall be responsible for transferring or authorizing the transfer of the utility accounts to Wife's name. Wife affirms that she is not aware of any outstanding bills related to the house for which she seeks reimbursement from Husband. . . .

As security for Husband's obligation to convey clear title to the Hollow Cove property to Wife and to make the mortgage payments on that property, as

> specified under the terms of this agreement, and as additional security for Husband's obligations to pay the monthly alimony and health insurance payments or the health care costs as specified hereinabove, Husband shall grant Wife a mortgage as to his half interest in the Hollow Cove property, such mortgage to be in a form deemed satisfactory to counsel for Wife and Husband. Additionally, in the event there are any liens in existence at the time this property is to be transferred to Wife, Husband shall be responsible for obtaining a release of the property from any such liens, within 30 days of notice.

Section IV of the Agreement, Division of Marital Property, provides that Plaintiff shall have use, possession, and ownership of the Marital Residence. Section IV further directly refers back to Section III, Alimony, and provides that the actual transfer of title to Plaintiff shall not occur until Debtor pays the mortgage indebtedness in full or any other event occurs as provided in Section III.[3] Section IV further reiterates that Debtor is to make the monthly mortgage payments on the Marital Residence and pay all such outstanding indebtedness by September 2005.

7. Pursuant to the Agreement, the $1,000.00/month payments (the "Cash Payments") to be paid directly to Plaintiff are to be reduced to $300.00/month in September 2005 and then are to terminate in September 2009. The Agreement provides that the $1,000/month payments shall be taxable to Plaintiff and deductible by Debtor.

8. In addition to the Cash Payments, as set forth in Section III of the Agreement and as stated above, Debtor is to make all monthly mortgage payments until September 2005 (the "Mortgage Payments"), when he must pay in full and satisfy the mortgage indebtedness. The Agreement further provides that up to $1,000.00 of the Mortgage Payments are taxable to Plaintiff and deductible by Debtor. The Agreement also gives Debtor the option of deducting up to $1,000 from the monthly mortgage obligation and paying the amount directly to Plaintiff.

9. The Agreement further provides that Debtor would retain ownership of his business

---

[3] Debtor does not dispute his obligation to transfer the title to the Marital Residence to Plaintiff according to the Agreement.

4

property on which his law office was located.

10.  During the divorce proceedings, a certified financial planner (the "CFP") (and formerly a practicing attorney) was hired to examine the parties' financial situation and suggest ways in which the parties could gain control of their finances and structure payment obligations in a way that would be mutually beneficial to both Plaintiff and Debtor.

11.  Both Debtor and Plaintiff testified as to the intent of the parties in entering into the Agreement and with respect to the obligations at issue. Neither party presented testimony from counsel that represented them during their divorce proceedings.

12.  The CFP testified that he was initially contacted by Plaintiff's divorce counsel and discussed the structuring of an agreement with Plaintiff's divorce counsel and the parties. He further testified that he attempted to balance the tax benefits and consequences of the relevant obligations to both parties, and determined that it "made sense" to treat some of the payments as alimony. He indicated that his recommendation was that the Cash Payments and $1,000 of the monthly Mortgage Payments be labeled as alimony in order for Debtor to be able to deduct those payments on his tax returns and in order to limit the taxable income to Plaintiff. The CFP also stated that his analysis was based upon the Internal Revenue Service definition of alimony and not that of any South Carolina statute or definition or other provision. He also indicated that he did not make any recommendations with respect to the support and maintenance to be paid by Debtor to Plaintiff nor whether the Mortgage Payments over $1,000.00 were considered alimony, support, or maintenance beyond such IRS definition. He did testify that in his experience, alimony is a form of spousal support and that certain payments can be structured as support payments that do not meet the Internal Revenue Code's definition of "alimony."

13.  The CFP also indicated that he was aware that one of the objectives was for Plaintiff and

5

the parties' children to remain in the Marital Residence.

14.  Both parties to the Agreement were represented by counsel. The Divorce Decree indicates that both parties were extensively questioned by the Family Court as to their understanding of all of the terms and conditions of the Agreement, the fairness of the Agreement, and whether they entered into the Agreement freely and voluntarily, without threat, duress or coercion. Both parties stated that they were aware of the financial position of the other and that they desired the Family Court to approve the Agreement and incorporate and merge the terms and conditions of the Agreement into the Family Court's order, so as to be enforceable by the Family Court.

15.  At some point in time following entry into the Agreement, Debtor became delinquent on payment of the Mortgage Obligations.

16.  Debtor filed for protection under Chapter 7 of the United States Bankruptcy Code on June 19, 2003.

17.  On July 31, 2003, shortly after Debtor's bankruptcy filing, a Consent Order was entered through which the Marital Residence was abandoned from the estate and the automatic stay was lifted for the mortgagee to pursue its nonbankruptcy remedies. Foreclosure proceedings have since been commenced in state court.

18.  Plaintiff filed the Complaint on June 24, 2004, seeking a determination that the debts listed above are nondischargeable pursuant to 11 U.S.C. § 523(a)(5).

19.  At or about the time of trial, the balance on the first mortgage to Carolina First was approximately $63,673.00 and the balance on the second mortgage to Rachel Lindler[4] was approximately $18,000.00.

---

[4] Testimony was presented at trial that Rachel Lindler was a client or former client of Debtor's that lent him money.

20. Debtor's Schedules specifically list the obligations at issue. Debtor's Schedule E is labeled "Type of Priority: Alimony, Maintenance, or Support" and lists the mortgages on the residence and future alimony in an unknown amount. Debtor's Schedule J shows alimony or support payments in the amount of $3,817.00. This appears to include the Cash Payments as well as the Mortgage Payments.

21. On December 15, 2004, this Court entered an Order granting partial summary judgment (the "Summary Judgment Order") to Plaintiff finding that the Cash Payments and the $1,000.00 portion of the monthly Mortgage Payments were nondischargeable pursuant to 11 U.S.C. § 523(a)(5) based upon the doctrine of quasi-estoppel and Debtor's regular treatment of those payments as alimony on his tax returns.

22. Prior to trial, the Court ruled upon several motions of the parties to exclude evidence. Those rulings are reflected by separate Orders dated January 12, 2005.

23. Following the Summary Judgment Order, the nondischargeability of the portion of the mortgage payments over the $1,000 already addressed (the "Excess Mortgage Payments") as well as the obligation of Debtor to pay in full and satisfy, by September 1, 2005, the current mortgage indebtedness on the Marital Residence (the "Mortgage Satisfaction Obligation"), were the issues remaining for trial.

## CONCLUSIONS OF LAW

11 U.S.C. § 523(a)(5) provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental

7

unit, or property settlement agreement, but not to the extent that--
**(A)** such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 408(a)(3) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State); or
**(B)** such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

11 U.S.C. § 523(a)(5). The party objecting to the discharge of an obligation pursuant to § 523(a)(5) bears the burden of proof by a preponderance of the evidence. In re Seybt, Nos. 01-03549-W, 01-80128-W, 2002 WL 342346, at *2 (Bankr. D.S.C. Jan. 14, 2002). Baker v. Baker (In re Baker), 274 B.R. 176, 187 (Bankr. D.S.C. 2000).

In order to determine whether an obligation arising from a separation agreement or divorce decree is a nondischargeable obligation in the nature of alimony, maintenance, or support pursuant to 11 U.S.C. § 523(a)(5), bankruptcy courts consider the intent of the parties at the time the agreement was executed. Tilley v. Jessee, 789 F.2d 1074, 1077 (4th Cir. 1986); Baker, 274 B.R. at 188. See also Kinder v. Kinder (In re Kinder), C/A No. 02-10519, Adv. Pro. No. 02-80342, slip op. at 4 (Bankr. D.S.C. Feb. 10, 2003).

"[T]here is no uniformly accepted calculus employed by bankruptcy courts to determine the nature of various obligations; rather, a determination under § 523(a)(5) is a fact intensive analysis which allows courts to use numerous factors on a case-by-case basis." In re Baker, 274 B.R. at 188 (citation omitted). The primary issue is one of mutual intent. Tilley, 789 F.2d at 1077-78. Additionally, this Court has examined other factors to determine the nature of the obligation as follows:

1)  The actual language of the agreement;
2)  The financial situation of the parties at the time of the agreement, including their prospects for future income;
3)  The function served by the obligation at the time of the agreement; and

>   4)   Whether there is any evidence of overbearing at the time of the agreement that causes a court to question the intent of a spouse.

See Baker, 274 B.R. at 189. See also Kinder v. Kinder (In re Kinder), C/A No. 02-10519, Adv. Pro. No. 02-80342, slip op. at 4 (Bankr. D.S.C. Feb. 10, 2003). The use of these four factors has been cited with approval by the Fourth Circuit in an unpublished decision. Catron v. Catron (In re Catron), No. 94-1279, 1994 WL 707966, at **4 (4th Cir. Dec. 21, 1994) (noting approval of the bankruptcy court's consideration of the four factors derived from the decision in Kettner v. Kettner, No. 91-587-N (E.D. Va. 1991)). See, e.g., Brunson v. Austin (In re Austin), 271 B.R. 97 (Bankr. E.D. Va. 2001) (examining the four factors).[5]

Although the Court is to examine the true intent of the parties rather than the labels attached to an agreement, the written agreement can be considered "persuasive evidence of intent." Tilley, 789 F.2d at 1077-78. Where an agreement goes so far as to exhibit a structure dealing with separate issues in distinct segments of an agreement beyond mere labels, the Fourth Circuit Court of Appeals has concluded that such an agreement erects "a substantial obstacle" to be overcome. Id. The term "substantial obstacle" does not imply a shifting of the parties' burdens, rather it is "a comment on the weight to be given the agreement . . . ." Catron, 1994 WL 707966, at **3.

## I. THE AGREEMENT AND INTENT OF THE PARTIES

In this case, the Agreement of the parties was specifically structured to separate the types of obligations and even in some instances characterized the nature and purpose of those

---

[5] Similar to factor number two, the financial situation of the parties at the time of the agreement, this Court has also considered the degree to which the obligation enables the recipient to maintain daily necessities. Seybt v. Seybt, No. 01-80128, 2002 WL 342346, at *2 (Bankr. D.S.C. Jan. 14, 2002) (citation omitted) (finding that debtor's obligation to pay the second mortgage was indicative of a debt intended to be in the nature of support because spouse and children could continue to reside in the home).

9

obligations. The Agreement includes a separate heading in Section III entitled "Alimony." This section describes the Cash Payments to be made each month in the amount of $1,000.00,[6] which are to be reduced to $300.00/month commencing in September 2005, the same month in which the Agreement also provides the mortgage indebtedness is to be paid in full by Debtor as an alimony obligation.

> Section III, Alimony additionally provides, with respect to the Mortgage Payments:
>
> D.    Monthly Residence Payments as Alimony: As an additional incident of support for the benefit of Wife, without which Wife would be unable to meet her daily needs, Husband is required to pay in full and satisfy, by September 1, 2005, the current indebtedness on the Hollow Cove residence . . . . However . . . the parties agree that no more than $1,000 per month of the principal payments made by Husband on the two residence mortgages shall be treated as alimony to Wife, taxable to Wife and deductible by Husband. As an alternative, Husband may, at his election, deduct up to $1,000 from the monthly mortgage obligation and pay that amount directly to Wife as alimony.

Inasmuch as $1,000/month of the Mortgage Payments has been previously determined to be nondischargeable pursuant to this Court's December 15, 2004 Order, it is the Excess Mortgage Payments and the Mortgage Satisfaction Obligation that primarily remain to be determined.

It is clear that the language and structure of the Agreement demonstrate an intent to separate alimony, support, and maintenance from a property settlement. The parties separately categorized the obligations of the parties and described the purpose of the Mortgage Payments and the Mortgage Satisfaction Obligation as an incident of support without which Plaintiff would be unable to meet her daily needs. Accordingly, the Agreement standing alone erects a substantial obstacle for Debtor to overcome.

---

[6] As previously stated, the Cash Payments have been determined to be nondischargeable based upon Fourth Circuit precedent and the doctrine of quasi-estoppel, as provided in this Court's December 15, 2004 Order.

10

The intent of the parties as exhibited by the Agreement was further corroborated by Plaintiff's testimony. See Catron, 1994 WL 707966, at **3 (party with burden of proving nondischargeability can produce agreement as persuasive evidence of the parties' intent; party opposing dischargeability would need to rebut the language of the agreement). See also Lawson v. Lawson (In re Lawson), Nos. 92-2154, 92-2163, 1993 WL 513830, at **7 (4th Cir. Dec. 9, 1993) ("Although an agreement standing alone is not necessarily dispositive, it may produce a presumption, which, if collaborated by the testimony, will be enough to establish intent.") (citing Tilley, 789 F.2d at 1078).

Plaintiff testified that the parties intended for the Mortgage Payments to be in the nature of alimony or support. Plaintiff at the time of the Agreement was a homemaker that was receiving disability payments of $594.00/month for her own needs and $194.00/month to care for the parties' children. Debtor was employed by his law firm making approximately $305,000.00/year. Plaintiff testified that the parties were aware that she needed income to take care of their children and agreed that instead of increased amounts of cash payments, Debtor would be responsible for the Mortgage Payments as an incident of support/alimony.

In order to rebut the evidence of intent provided by the language of the Agreement and the testimony of Plaintiff, Debtor provided his own testimony and that of the CFP. He did not offer the testimony of his counsel during the divorce proceedings that was a signatory on the Agreement and present during the Family Court hearings.

Debtor did not dispute Plaintiff's minimal income at the time of the Agreement nor that Plaintiff would have been unable to sustain the Mortgage Payments in order for Plaintiff and the parties' children to remain in the Marital Residence. However, Debtor contends that he did not intend to pay Plaintiff alimony because he believed that she had committed adultery, and that

11

adultery is a bar to alimony in South Carolina.[7] He further testified that upon advice of the CFP hired by the parties to advise them during their proceedings, designating a portion of the Mortgage Payments as alimony would provide beneficial tax consequences. Debtor stated that he considered the Excess Mortgage Payments and the Mortgage Satisfaction Obligation as part of a property settlement, and that he has never claimed them as an alimony deduction on his tax returns or financial declarations. Debtor did not directly address whether the payments were intended by the parties to be support, "without which [Plaintiff] would be unable to meet her daily needs" as stated in the Agreement. Instead, his testimony focused upon his belief that the payments were not alimony, and that he did not intend to pay Plaintiff alimony based upon the adultery allegations.[8]

Whether a particular debt is a nondischargeable obligation in the nature of alimony, maintenance, or support is a question of federal bankruptcy law. See Long v. West (In re Long), 794 F.2d 928, 930 (4th Cir. 1986) ("The parties correctly conclude that the determination of whether alimony is for the recipient's maintenance and support for purposes of bankruptcy dischargeability is a matter of federal, not state, law."). See also D'Agostino v. Genovese (In re Genovese), No. 95-1984, 1996 WL 516160 at **1 (4th Cir. Sept. 12, 1996) ("Whether a debt is in the nature of alimony, maintenance, or support is a question of Federal Bankruptcy law."); Gianakas v. Gianakas (In re Gianakas), 917 F.2d 759, 762 (3rd Cir. 1990) ("Whether the obligation is in the nature of alimony, maintenance or support for the purposes of the Bankruptcy Code is a question of federal, not state, law."); In re Evans, 278 B.R. 407, 410 (Bankr. D. Md.

---

[7] Evidence of allegations of adultery at trial was the subject of a motion in limine and Order entered by the Court on January 12, 2005. The Court permitted Debtor to testify as to his belief that Plaintiff had committed adultery and the effect that belief had upon his intent in entering into the Agreement.

[8] Pursuant to South Carolina law, no alimony may be awarded a spouse who commits adultery during the time periods provided in S.C. Code § 20-3-130. See S.C. Code Ann. § 20-3-130 (West Supp. 2004).

12

2002) ("As is clear from case law, a determination of whether a debt is in the nature of alimony, maintenance, or support under § 523(a)(5) is a question of federal bankruptcy law and the intent of the parties at the time of the divorce decree."); Burns v. Burns (In re Burns), 186 B.R. 637, 641 (Bankr. D.S.C. 1992) ("The determination of dischargeabilty must be made according to federal law, not state law.").

Additionally, pursuant to federal law, "[t]he great weight of authority holds that a spouse's assumption of mortgage debts which enable members of the family to remain in the marital residence is an obligation in the nature of support, maintenance or alimony." In re Gianakas, 917 F.2d at 764. See also McGuire v. McGuire (In re McGuire), Nos. 01-05872-W, 01-80234-W, slip op. at *4-5 (Bankr. D.S.C. Mar. 18, 2002)(holding that debtor's obligation to pay a second mortgage is nondischargeable in light of the fact that payments afforded debtor's former spouse and daughter with shelter); Seybt v. Seybt (In re Seybt), Nos. 01-03549-W, 01-80128-W, 2002 WL 342346, at *2 (Bankr. D.S.C. Jan. 14, 2002) (same); In re Burns, 186 B.R. at 642 (same); Cribb v. Cribb (In re Cribb), 34 B.R. 862, 865 (Bankr. D.S.C. 1983) (same). In the matter before the Court, both Plaintiff and the parties' children were to reside in the Marital Residence. Based upon the evidence and the testimony presented, without the Mortgage Payments provided by Debtor, Plaintiff would not have been able to occupy the home nor provide payment for mortgage or rent for the children.[9]

The Agreement does not reference adultery by either party, and the parties were awarded a divorce based upon the grounds of one year's separation. The parties both testified that the Family Court questioned them regarding the Agreement, and the Divorce Decree provides that

---

[9] Plaintiff testified that she was awarded custody of the children. The Agreement refers to a joint custody arrangement. Nevertheless, Debtor did not dispute that the children were to reside in the Marital Residence with Plaintiff, even if on a part-time basis.

13

the parties indicated the Agreement was understood by both parties, was fair, and was entered into freely and voluntarily, without threat, duress, or coercion. Debtor was not an unsophisticated participant in the divorce proceedings. At the time of the Agreement, he had been a practicing attorney for many years and was represented by counsel. Accordingly, Debtor's argument that his intent was not to provide alimony based upon his belief that Plaintiff committed adultery does not persuade the Court that the obligations at issue are not in the nature of alimony, support, or maintenance. Other courts have similarly discounted the argument that the debtor's intent was not to pay alimony because of a belief that the spouse committed adultery. See Catron v. Catron (In re Catron), 164 B.R. 912, 920-21 (E.D. Va. 1994) (debtor that claimed he did not intend to pay alimony because he thought had a strong adultery claim should have refused to sign the settlement agreement until such provision was excised), aff'd, Catron, No. 94-1279, 1994 WL 707966 (4th Cir. Dec. 21, 1994); Melichar v. Ost, 7 B.R. 951, 967 (D. Md. 1980) (finding that issue of adultery was irrelevant since the agreement was entered into with full knowledge of adultery).

Debtor did not convince the Court that at that time his belief that Plaintiff had committed adultery would necessarily preclude his express agreement and resulting obligation to Plaintiff for support. In sum, even taking into consideration the Debtor's stated belief that he did not intend to consent to alimony because of his belief that Plaintiff committed adultery, Debtor's own testimony and the evidence presented was insufficient to rebut the presumption created by the Agreement and Plaintiff's testimony that the intent of the parties was to provide support for Plaintiff. See Tilley, 789 F.2d at 1077-78.

Furthermore, the testimony of the CFP did not convince the Court that the Excess Mortgage Payments were not in the nature of alimony, maintenance, or support. His testimony

14

was clear with respect to his analysis of the parties' financial condition at the time of the Agreement and the tax reasons behind categorizing the Cash Payments and the $1,000 portion of the Mortgage Payments as alimony within the definition of the Internal Revenue Code. However, he acknowledged that maintenance and support may be separate from the tax definition of alimony and that his overall objective was to suggest a payment structure that was beneficial to both parties and limited their tax liabilities. He further testified that part of the objective in structuring the Agreement was for Plaintiff and the children to remain in the Marital Residence. However, his testimony did not satisfactorily address the intent of the parties with respect to the Excess Mortgage Payments and Mortgage Satisfaction Obligation. The CFP's testimony did not convince the Court that the parties intended for the obligations at issue to be other than in the nature of alimony, maintenance, or support.

Finally, Debtor's Schedule E is labeled "Type of Priority: Alimony, Maintenance, or Support" and lists the mortgages on the residence and future alimony in an unknown amount. Debtor's Schedule J shows alimony or support payments in the amount of $3,817.00. Although not dispositive, Debtor's listing of the obligations at issue on his Schedules as alimony, maintenance, or support weighs in favor of Plaintiff.

In sum, the Agreement clearly separates the payment obligations, and provides for payment of the Excess Mortgage Payments and the Mortgage Satisfaction Obligation under the section entitled "Alimony." The parties characterized these obligations as "an additional incident of support for the benefit of [Plaintiff], without which [Plaintiff] would be unable to meet her daily needs." Although a portion of the Mortgage Payments is referenced in the Division of Marital Property portion of the Agreement, it appears to merely reiterate in a summary fashion what was provided for in the Alimony portion of the Agreement. The language

and structure of the Agreement thus reveal an intent to separate alimony and support from other portions of the Agreement. Tilley, 789 F.2d at 1077-78 (where agreement exhibited a structured drafting that dealt with separate issues in distinct segments, the agreement revealed an intent to separate alimony).

Accordingly, based upon the Agreement of the parties, corroborated by the testimony of Plaintiff, it appears that the intent of the parties was for the Excess Mortgage Payments and the Mortgage Satisfaction Obligation to be in the nature of alimony, maintenance, or support. Debtor's testimony, and that of the CFP, was insufficient to overcome such evidence. See Tilley, 789 F.2d at 1077-78 (testimony contrary to the language of the agreement was insufficient to overcome substantial obstacle created by the label placed on the obligations and the structured drafting of the document).

## II.    ADDITIONAL FACTORS

As previously stated, this Court has previously considered additional factors to determine whether an obligation is nondischargeable pursuant to § 523(a)(5) as follows:

1) The actual language of the agreement;
2) The financial situation of the parties at the time of the agreement, including their prospects for future income;
3) The function served by the obligation a the time of the agreement; and
4) Whether there is any evidence of overbearing at the time of the agreement that causes a court to question the intent of a spouse.

See Baker, 274 B.R. at 189. See also In re Kinder, C/A No. 02-10519, Adv. Pro. No. 02-80342, slip op. at 4. See generally Catron, 164 B.R. at **4 (noting approval of the bankruptcy court's consideration of the four factors derived from the decision in Kettner v. Kettner, No. 91-587-N (E.D. Va. 1991)). This Court has already discussed the actual language of the Agreement and finds that this first factor supports a determination that the Excess Mortgage Payments and Mortgage Satisfaction Obligation are in the nature of alimony, maintenance, or support.

Further, with respect to the second factor, it appears undisputed that Debtor's income was substantially greater than Plaintiff's at the time of the Agreement and that Plaintiff's income at that time was insufficient to provide housing and support for the parties' children. Plaintiff also testified that she is disabled due to an injury to her back and has had numerous operations. She further testified that she could not continue working toward a college degree as a result. Debtor acknowledged Plaintiff's back injury and did not dispute her physical or financial condition at the time of the Agreement. Further, the parties agreed that Debtor was to pay for Plaintiff's health insurance coverage, as provided in the Agreement, for a period of thirty-six (36) months following the Agreement. Accordingly, based upon the testimony of the parties and the language of the Agreement, Plaintiff's continuing need for medical support was foreseeable and appears to have been considered by the parties. Finally, it appears undisputed that Debtor's prospects for future income were substantially greater than Plaintiffs.[10]

The third factor to consider is the role the obligation was intended to perform at the time the parties entered into the Agreement. An obligation that "serves to provide such daily necessities as food, clothing, shelter, and transportation is indicative of debt intended to be in the nature of support." Kettner, 1991 WL 549386, at *2. As previously noted, the actual language of the Agreement provides that the purpose of the obligations was to provide for the daily needs of Plaintiff. Plaintiff corroborated this purpose by her testimony. An obligation that enables members of the family to remain in the marital residence is considered by bankruptcy courts as an obligation in the nature of support, maintenance or alimony. See, e.g. McGuire v. McGuire

---

[10]   This Court has also considered the degree to which the obligation enables the recipient to maintain daily necessities, which can be considered a corollary to this factor. Seybt v. Seybt, No. 01-80128, 2002 WL 342346, at *2 (Bankr. D.S.C. Jan. 14, 2002) (citation omitted) (finding that debtor's obligation to pay the second mortgage was indicative of a debt intended to be in the nature of support because spouse and children could continue to reside in the home).

17

(In re McGuire), Nos. 01-05872-W, 01-80234-W, slip op. at *4-5 (Bankr. D.S.C. Mar. 18, 2002) (holding that debtor's obligation to pay a second mortgage is nondischargeable in light of the fact that payments afforded debtor's former spouse and daughter with shelter); Seybt v. Seybt (In re Seybt), Nos. 01-03549-W, 01-80128-W, 2002 WL 342346, at *2 (Bankr. D.S.C. Jan. 14, 2002) (same). Furthermore, the Cash Payments are structured such that they are to be reduced from $1,000.00 to $300.00 in September 2005 – the same time the Agreement contemplates that Debtor shall have satisfied the mortgages on the Marital Residence. These payments appear to be closely linked and lend support to the Plaintiff's argument that they were intended to provide her and the children with support.[11]

The fourth factor to be considered is whether there is any evidence of overbearing at the time of the Agreement. The Court finds no such evidence in the record. To the contrary, both parties were represented by counsel and acknowledged that the Family Court held a hearing with respect to the Agreement and were questioned regarding their understanding of the Agreement and its fairness. The parties requested that the Family Court incorporate the Agreement into the Divorce Decree.

## III. CONCLUSION

Weighing the factors addressed above, the evidence presented, including the Agreement and the testimony presented, the Court finds that Plaintiff met her burden of proving that the Excess Mortgage Payments and the Mortgage Satisfaction Obligation are in the nature of alimony, maintenance, or support within the meaning of 11 U.S.C. § 523(a)(5).

---

[11] The parties also agreed for Debtor to maintain his ownership of his law firm and the real property thereon, and Plaintiff was to retain the Marital Residence. The Court notes, however, that the parties agreed for Plaintiff to retain other property, including an unimproved lot in North Carolina, and other personal property. Further, Debtor did not argue that continued ownership in his law firm was an offset to retention of the Marital Residence by Plaintiff.

18

Accordingly, it is hereby

**ORDERED** that the portion of the mortgage payments on the Marital Residence over and above the $1,000.00 already addressed by summary judgment are nondischargeable pursuant to 11 U.S.C. § 523(a)(5) (defined herein as the "Excess Mortgage Payments"); and it is further

**ORDERED** that Debtor's obligation to pay in full and satisfy, by September 1, 2005, the current indebtedness on the Marital Residence (defined herein as the "Mortgage Satisfaction Obligation") is likewise nondischargeable pursuant to 11 U.S.C. § 523(a)(5); and it is further

**ORDERED** that Debtor's counterclaims, to the extent remaining, are denied.[12]

**AND IT IS SO ORDERED.**

*/s/ John E. Waites*
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina,
March 22, 2005.

---

[12] Debtor asserted counterclaims alleging that the Complaint was not timely filed and contesting nondischargeability in that Plaintiff never filed a proof of claim in Debtor's bankruptcy case. These issues are not addressed in the parties' joint pre-trial order are deemed to have been abandoned.

19